# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued November 21, 2025        Decided July 24, 2026

No. 24-7140

JANNEASE JOHNSON,
APPELLEE

v.

DISTRICT OF COLUMBIA, ET AL.,
APPELLANTS

———

Appeal from the United States District Court
for the District of Columbia
(No. 1:20-cv-02944)

———

*Stacy Anderson*, Senior Assistant Attorney General, Office of the Attorney General for the District of Columbia, argued the cause for appellants. With her on the briefs were *Brian L. Schwalb*, Attorney General, *Caroline S. Van Zile*, Solicitor General, *Ashwin P. Phatak*, Principal Deputy Solicitor General, and *Thais-Lyn Trayer*, Deputy Solicitor General.

*Joseph M. Hannon Jr.* argued the cause for appellee. With him on the brief was *Daniel S. Crowley*.

Before: PILLARD and WALKER, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

2

Opinion for the Court filed by *Circuit Judge* PILLARD.

PILLARD, *Circuit Judge*:   In her 28th year of service working for the D.C. Department of Corrections, Sergeant Jannease Johnson was fired.  She contends that her supervisors fired her in retaliation for speech protected by the First Amendment and the D.C. Whistleblower Protection Act— namely, sharing emails she received in the course of her work with her union's attorneys and a journalist, and giving an interview to a local news network about D.C. prison conditions during the COVID-19 pandemic.  She brings a damages action against the officials responsible for her firing.  The defendant officials moved for summary judgment on grounds of qualified immunity.  The district court denied the motion in part.  The officials now bring an interlocutory appeal, reasserting qualified immunity.

We reverse in part and affirm in part.  The officials committed no constitutional violation if they fired Johnson for sharing confidential emails.  But on the record evidence as the district court assessed it on summary judgment, there is a material factual dispute as to whether one official violated the First Amendment by firing Johnson for granting a press interview.  The law clearly establishes Johnson's right to speak on matters of public concern without retaliation when her government employer lacks a countervailing interest in her silence, so if Johnson carries her burden at trial, the defendant official has no entitlement to qualified immunity.

## I.

### A.

Sergeant Jannease Johnson worked at the D.C. Department of Corrections (the Department) from 1992 to 2020.  By March 2020, she was serving as Lead Correctional Officer in the D.C.

Jail and as Adjustment Board Chair of an inmate disciplinary body. In her Board role, Johnson received emails from the Department's internal listserv notifying select staff of incidents raising safety or disciplinary concerns.

Johnson was also an elected leader of the correctional officers' union, serving as Executive Secretary of the Fraternal Order of Police Department of Corrections Labor Committee (Union). As the COVID-19 pandemic surged, Johnson grew critical of what she believed were serious lapses in the Department of Corrections' responses. She and other Union leaders started meeting regularly with the Union's attorneys to discuss whether the Department's policies adequately protected staff and inmates. Johnson also began forwarding Department emails on the topic from her official Department account to the Union attorneys. The emails included information about the unavailability of masks for staff, officers' exposure to infected inmates, and the lack of quarantine and contract tracing measures. Union attorneys used information that Johnson provided in an amicus brief challenging prison conditions, in multiple Union filings alleging that the Department engaged in unfair labor practices related to the pandemic, and in a class-action challenge to Department workplace-safety practices.

On April 22, inmates at the D.C. Jail staged a protest over the Jail's conditions by rejecting the food brought to their cells. Johnson received an email on the Department's safety listserv with the subject line "Planned use of force" discussing the Jail's response to the protest. Johnson forwarded that email to the Union's attorneys, who then forwarded the email to a local reporter. The reporter included Johnson's email in a message asking for comment from a communications official from the Department. The communications official passed on the message to the Department's Deputy Director, Wanda Patten,

who replied that Johnson had violated the Department's policies by forwarding the email outside the Department.

The Department then launched an investigation into Johnson's email usage since the start of the pandemic. Three days later, "pending investigation into misconduct" on Johnson's part, the Department removed Johnson from her post as Adjustment Board Chair. *Johnson v. D.C.*, 726 F. Supp. 3d 8, 20 (D.D.C. 2024).

On April 28, an attorney for the Union notified the Department that Johnson had agreed to be interviewed by a local news station, WUSA 9. Patten received a copy of the Union's email. Statements from Johnson's interview were recorded for a news segment and published on May 1 in "an article critical of [the Department's] response to the growing pandemic." *Id.*

Two weeks later, the Department completed its investigation regarding the emails, concluding that Johnson had forwarded twenty-two emails to the Union's attorneys and thereby "violated [the Department's] policies and the Health Insurance Portability and Accountability Act ('HIPAA')." *Id.* Patten received draft removal paperwork for Johnson on May 5 and issued Johnson a notice of proposed removal from her job on May 29. The notice charged Johnson with violations of D.C. and Departmental regulations and confidentiality policies.

A hearing officer reviewed the proposed removal and recommended a different outcome: not a termination, but a reprimand or suspension in light of the circumstances of the pandemic, Johnson's long and otherwise unblemished record, and the D.C. Whistleblower Protection Act. Department Director Quincy Booth reviewed the recommendation and "remanded the case" to the hearing officer, asking her to "reevaluate the materials presented" and "conclude" that

5

Johnson violated the Department's rules and regulations prohibiting unauthorized disclosures as well as HIPAA. *Id.* (quoting Booth Memorandum 1 (J.A. 390)). On remand, the hearing officer found no violation of HIPAA when Johnson shared health information with the Union attorneys for purposes of obtaining legal advice, but she agreed with Booth that Johnson had violated the Department's rules and policies when Johnson's attorneys shared information with the media. Second Hoffman-Peak Memorandum 2-3 (J.A. 405-06). The hearing officer ultimately concluded that termination was "supported" and "reasonable." *Johnson*, 726 F. Supp. 3d at 21 (quoting Second Hoffman-Peak Memorandum 5 (J.A. 408)). Booth then issued a notice terminating Johnson's employment.

**B.**

Johnson filed suit in D.C. Superior Court against Patten, Booth, and the Department. As relevant here, she claimed that Patten and Booth violated her First Amendment rights and sought relief under 42 U.S.C. § 1983. Defendants removed the case to federal court, where Johnson defeated a motion to dismiss. Following discovery, the parties cross-moved for summary judgment. On the First Amendment claim, the district court denied both motions, holding that Johnson raised triable issues of fact material to the constitutional claim and that the individual defendants lacked qualified immunity. Defendants sought reconsideration of that ruling, which the district court denied.

The individual defendants immediately appealed.

**II.**

Johnson moved to dismiss the appeal for lack of jurisdiction. A motions panel of this court deferred decision of the motion in favor of our consideration of the jurisdictional

question together with the merits of the qualified immunity appeal. We accordingly begin by addressing jurisdiction.

"An order denying a motion for summary judgment is generally not a final decision within the meaning of [28 U.S.C.] § 1291 and is thus generally not immediately appealable." *Plumhoff v. Rickard*, 572 U.S. 765, 771 (2014). But a different rule applies "when the summary judgment motion is based on a claim of qualified immunity." *Id.* In such a case, the collateral order doctrine applies, and the district court's order, "to the extent that it turns on an issue of law, is an appealable 'final decision' within the meaning of . . . § 1291." *Mitchell v. Forsyth*, 472 U.S. 511, 530 (1985); *see Plumhoff*, 572 U.S. at 772. We thus have jurisdiction to review the district court's legal conclusions on qualified immunity, accepting as established "all of the conduct which the [d]istrict [c]ourt deemed sufficiently supported for purposes of summary judgment." *EIG Energy Fund XIV, L.P. v. Petroleo Brasileiro, S.A.*, 104 F.4th 287, 293 (D.C. Cir. 2024) (quoting *Behrens v. Pelletier*, 516 U.S. 299, 313 (1996)).

The limited scope of our review bears emphasis. At this interlocutory stage, we have no power to review those "portion[s] of [the] district court's summary judgment order that . . . determine[] only a question of 'evidence sufficiency,' *i.e.*, which facts a party may, or may not, be able to prove at trial." *Johnson v. Jones*, 515 U.S. 304, 313 (1995). We thus treat as conclusive for current purposes the district court's determinations on the sufficiency of the evidence to raise material issues of fact precluding summary judgment. Our consideration focuses on the clarity of the relevant law as applied in the circumstances before us.

## III.

We review *de novo* the district court's conclusions of law supporting a denial of qualified immunity. *Youngbey v. March*, 676 F.3d 1114, 1117 (D.C. Cir. 2012). To overcome a defense of qualified immunity, a plaintiff must show that defendants' "conduct violated a [federal] right" and that "the right in question was clearly established at the time of the violation." *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (internal quotation marks and citations omitted) (modification in original).

Johnson claims a violation of her First Amendment right to communicate as a citizen on a matter of public concern. "The First Amendment limits the ability of a public employer to leverage the employment relationship to restrict" or punish its employees' free speech. *Garcetti v. Ceballos*, 547 U.S. 410, 419 (2006). Although "[g]overnment employers, like private employers, need a significant degree of control over their employees' words and actions," they are also bound to respect "the liberties [government] employees enjoy in their capacities as private citizens." *Id.*

The Supreme Court developed a framework for balancing the interests of the government and its employees in *Pickering v. Board of Education of Township High School District 205*, 391 U.S. 563 (1968). Under the four-part *Pickering* test, an employee bringing a First Amendment retaliation claim must show that

> (1) she 'spoke[] as a citizen on a matter of public concern';
>
> (2) her interest in commenting on matters of public concern outweigh[ed] the government's 'interest in promoting the efficiency of the public services it performs through its employees';

(3) 'her speech was a substantial or motivating factor in prompting the retaliatory or punitive act'; and

(4) she can 'refute the government employer's showing, if made, that it would have reached the same decision in the absence of the protected speech.'

*Breiterman v. U.S. Capitol Police*, 15 F.4th 1166, 1176 (D.C. Cir. 2021) (first modification in original) (quoting *Wilburn v. Robinson*, 480 F.3d 1140, 1149 (D.C. Cir. 2007)). The first and second factors involve questions of law, while the third and fourth factors present questions of fact. *O'Donnell v. Barry*, 148 F.3d 1126, 1133 (D.C. Cir. 1998).

Johnson identifies two grounds for her First Amendment retaliation claims. First, she asserts that defendants "do not challenge the district court's determination that Johnson's disclosure to Union attorneys of internal DOC documents was a 'substantial' or 'motivating' factor in her termination." Appellee Br. 34.[1] Second, she relies on the district court's

---

[1] On reconsideration, the hearing officer concluded that Johnson "forward[ed] [an] email through her attorneys to the media," holding Johnson responsible for a Union attorney's disclosure to a journalist. Second Hoffman-Peak Memorandum 3 (J.A. 406). That Union attorney, J. Michael Hannon, now represents Johnson. At oral argument, Hannon explained that "the Hearing Officer . . . held [Johnson] responsible for" her attorneys' disclosure "because [the hearing officer] was, under the rules of professional responsibility, going to assume that since [Johnson's] lawyer did it, [Johnson] did it." Oral Arg. 42:58-43:11. Hannon appeared to be referencing an argument made by Booth when Booth remanded Johnson's charges to the hearing officer. *See* Booth Memorandum 3-4 (J.A. 392-93). Booth asserted that the "Hearing Officer must accept that Sgt. Johnson['s] representative attorneys had her approval to disclose the protected information to the media" since the attorneys would have

determination based on the evidence of record that "a reasonable jury could find that Johnson's WUSA 9 interview was a motivating factor in Patten's decision to fire her." *Id*. at 36 (quoting *Johnson*, 726 F. Supp. 3d at 36).

Applying the *Pickering* factors, we consider whether Johnson can demonstrate on either ground that defendants violated her First Amendment rights in a manner clearly established by governing precedent.

**A.**

Johnson cannot show that, if the jury were to find that defendants fired her because she forwarded emails in violation of confidentiality policies, defendants thereby violated any clearly established First Amendment right. As to the first *Pickering* factor, defendants agree that Johnson "spoke as a

violated Rule 1.2 of the District of Columbia Rules of Professional Conduct if they had failed to consult with Johnson. *Id.*

Hannon's reliance on Booth's reasoning raises a serious ethical concern regarding his representation of Johnson. Booth inculpated Johnson by relying on the assumption that Hannon acted ethically. Johnson's interests as his client thus came into direct conflict with Hannon's personal interests. The hearing officer found that Hannon had personally instructed Johnson to pass on to him internal Department information. *See* First Hoffman-Peak Memorandum 6 (J.A. 385) ("Sgt. Johnson was tasked by the Hannon Law Group with forwarding relevant email communications she received to the labor union's attorneys."); *e.g.*, S.J.A. 49; *id.* at 89-90. Hannon's decision to forward one such email to a journalist set off the inquiry that resulted in Johnson's firing. Appellee Br. 8-9. When asked at oral argument about the potential conflict, Hannon asserted that Johnson "had no idea that I was going to send [her email] to the press," Oral Arg. 42:10-42:39—casting doubt on Booth's reasoning and identifying himself as a potential fact witness in Johnson's suit, thereby confirming the conflict of interest.

citizen on an issue of public concern" about the Department's COVID-19 response when she sent the emails. Appellants Br. 36. But defendants vigorously contest the second factor, asserting that the Department's interest in the enforcement of its confidentiality policies outweighs Johnson's interest in sharing with Union counsel the content of confidential emails. On this point, defendants have the better of the argument.

The second *Pickering* factor requires us to identify the speech that "contributed to [Johnson's] discharge," *Connick v. Myers*, 461 U.S. 138, 149 (1983), and then balance Johnson's "interest in making her statement against 'the interest of the [government], as an employer, in promoting the efficiency of the public services it performs through its employees,'" *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) (quoting *Pickering*, 391 U.S. at 568). In conducting the balancing inquiry, we consider "the manner, time, and place of the employee's expression," as well as the "context in which the dispute arose." *Id.*

We begin by defining the speech at issue. Johnson first proposes that defendants fired her based on her "disclosure of emails." Appellee Br. 34. Director Booth, in his remand message to the hearing officer, identified eleven such emails as providing cause to terminate Johnson. Booth Memorandum 4-8 (J.A. 393-97). The emails contained information about the COVID status of individual inmates and staff members as well as information from the Department's internal Incident Notification Mailing List. *Id.* The district court found substantial "evidence in the record suggesting that Johnson did in fact violate [District of Columbia Municipal Regulations], [Department] policies, the collective bargaining agreement, and the confidentiality agreement she signed in 2015" by sending the emails. *Johnson*, 726 F. Supp. 3d at 33. And the district court noted that Johnson failed to "meaningfully

contest" that her policy violations could establish an "independent, legitimate reason for [d]efendants' decision to fire her." *Id.* Although Johnson now refers to the emails as containing "allegedly confidential information," Appellee Br. 33, she fails to develop an argument that her disclosures were consistent with Department policy. In any event, we lack authority to reexamine the district court's factual determinations in this interlocutory appeal.

Next, we identify the government's interest in disciplining Johnson for her speech. An employer who takes adverse action against an employee bears the burden to justify that action. *Baumann v. District of Columbia*, 795 F.3d 209, 216 (D.C. Cir. 2015). The Department "has a strong interest in employing officers and supervisors who can keep confidences." *Breiterman*, 15 F.4th at 1177; *see Johnson*, 726 F. Supp. 3d 8, 37-38 (D.D.C. 2024) (noting the Department's "asserted interest in maintaining the privacy of health information" of inmates and staff). A government manager may legitimately advance her employing agency's interest in its confidentiality policies by "[d]isciplining leaks—especially those that undermine trust and interfere with administrative and security functions." *Breiterman*, 15 F.4th at 1177. And the Department has memorialized its interest through "announced office polic[ies]" that underscore the priority it places on confidentiality. *Connick*, 461 U.S. at 153 & n.14; *see Johnson*, 726 F. Supp. 3d at 33, 37 (identifying confidentiality policies).

We recognize that Johnson, too, had "a strong interest in . . . speaking to the public about safety issues" related to the Department's management of the D.C. Jail during the pandemic. *Baumann*, 795 F.3d at 217. The district court concluded that the evidence showed that Johnson "had a significant interest in publicly detailing the 'rapid and dangerous spread of COVID-19 among [Department]

inmates[,] staff and their families,' as well as insufficient 'contact tracing,' [the Department's] allegedly 'inaccurate reporting of positive cases,' and [the Department's] alleged mismanagement of the COVID crisis." *Johnson*, 726 F. Supp. 3d at 36. During a rapidly escalating public health crisis, she sought to share information concerning staff and inmate safety inside the locked-down D.C. Jail.

But Johnson was "free to discuss [her concerns] publicly, as [she] did" in press conferences and court filings, so long as she refrained from passing on certain specifics—such as the infected status of particular staff members and inmates—in violation of Department policies. *Baumann*, 795 F.3d at 217. Importantly, Johnson acknowledges that she could have raised the same safety concerns without naming the individuals affected. Appellee Br. 28.

Given the district court's identification of the parties' respective interests as supported by the record evidence, the government's interest in enforcing its confidentiality policies outweighs Johnson's interest in sharing the confidential matters she disclosed. We accordingly hold that defendants did not violate Johnson's First Amendment rights if they fired her based on her disclosure of confidential emails to the Union. We thus reverse the district court's denial of qualified immunity as to that claim.

**B.**

Johnson may yet be able to show that Patten violated her First Amendment rights by firing her because of her interview with WUSA 9. As for the interview, defendants conceded the first two *Pickering* factors before the district court. They acknowledged that Johnson spoke as a private citizen and addressed a matter of public concern—namely, the "alleged spread of a contagious disease among [Department] personnel

and inmates due to [Department] mismanagement." *See Johnson*, 726 F. Supp. 3d at 35 (internal citation omitted). And they fail to identify any statement from Johnson's interview that interfered with the government's interests as an employer. *See id.* at 38. That omission makes sense. As a senior Department employee and a Union leader, Johnson had an unusually "beneficial and well-informed" perspective to share on the Department's actions during the pandemic—she could speak to the competing needs and interests of the Department, its rank-and-file workers, and the people in its custody. *Id.* at 36. Johnson's interview represents a paradigmatic case of a government employee "speak[ing] out on an issue that [she] is uniquely qualified to address," *O'Donnell*, 148 F.3d at 1135, and thereby supporting "informed decision-making by the electorate," *Pickering*, 391 U.S. at 572. Johnson satisfies the first two *Pickering* factors as a matter of law.

On the third *Pickering* factor, the district court examined the parties' evidence and reached divergent conclusions about the two defendants' motivations. It concluded that no "reasonable jury" could "find that Booth took retaliatory actions against Johnson because of her interview" where no evidence in the record "rebuts Defendant Booth's sworn statements" that he received no "notification of Sergeant Johnson's interview with WUSA 9'" and never learned about the published piece. *Johnson*, 726 F. Supp. 3d at 39 (quoting Booth Decl. ¶¶ 19-20 (J.A. 513)). In contrast, the district court concluded that "a reasonable jury could find that Johnson's WUSA 9 interview was a motivating factor in Patten's decision to fire her." *Id.* at 40. The court noted that Patten received an email informing her of Johnson's interview on April 28 and that WUSA 9 published an article critical of the Department on May 1. *Id.* at 20. It acknowledged Patten's claim that Patten decided to fire Johnson "at some point between April 23 and 27." *Id.* at 39. The district court reasoned, however, that a jury

could disbelieve Patten's factual narrative and instead infer from other circumstances, including the email evidence, that Patten became aware of the interview and that her displeasure at Johnson's public statements was a motivating factor in her decision shortly thereafter to terminate Johnson. *Id.* at 40 & n.10.

The district court's conclusions regarding the summary judgment record resolve our analysis of the third factor: Johnson's claim against Booth fails and her claim against Patten may proceed. Defendants contest whether Johnson has advanced sufficient evidence for a jury to conclude that Patten had a retaliatory motive. But that factual question lies outside the ambit of this interlocutory appeal. As explained, we lack jurisdiction to review "question[s] of 'evidence sufficiency,' *i.e.*, which facts [Johnson] may, or may not, be able to prove at trial." *Johnson*, 515 U.S. at 313.

Defendants insist that we may reconsider the district court's conclusions about the sufficiency of the evidence if they are "blatantly contradicted by the record." *Scott v. Harris*, 550 U.S. 372, 380 (2007). They highlight Patten's sworn statements that she never saw Johnson's interview and, in any event, agreed that Johnson should be terminated before April 28, when she received notice of Johnson's interview. Patten Decl. ¶¶ 19, 33 (J.A. 518-19). True, some of defendants' evidence supports that story, and defendants may be able to persuade a jury to reject Johnson's claim on the third *Pickering* factor. But other evidence supports Johnson's theory. For example, in denying defendants' motion for reconsideration, the district court noted that the hearing officer's initial decision states that Johnson's removal "was proposed by Wanda Patten[] on June 3." *Johnson v. District of Columbia*, No. CV 20-2944, 2024 WL 3858547, at *3 n.5 (D.D.C. Aug. 19, 2024). The district court evaluated the evidence under the summary

judgment standard. It was obligated to "view the evidence in the light most favorable to the nonmoving party . . . , draw all reasonable inferences in her favor, and eschew making credibility determinations or weighing the evidence." *Czekalski v. Peters*, 475 F.3d 360, 363 (D.C. Cir. 2007). It determined that Johnson had presented enough evidence to create a genuine dispute about Patten's motivations. Because accepting that conclusion does not require us to indulge any "visible fiction," *Scott*, 550 U.S. at 381, we cannot on this limited appeal dig deeper into the factual objections defendants raise.

That leaves the fourth *Pickering* factor: whether Johnson can disprove Patten's showing that she "would have reached the same decision in the absence of the protected speech." *Breiterman*, 15 F.4th at 1176 (quoting *Wilburn*, 480 F.3d at 1149). Patten has proffered evidence that she would have fired Johnson for violating the Department's confidentiality policies regardless of Johnson's interview with WUSA 9. *Johnson*, 726 F. Supp. 3d at 33. Before the district court, Johnson pointed to some evidence of pretext, including the hearing officer's initial statements that she "believes that the proposal for [Johnson's] removal is retaliatory in nature" and that "removal does not seem like a reasonable punishment" in light of "Johnson's record of twenty-nine years and no prior disciplines." First Hoffman-Peak Memorandum 7 (J.A. 386). But the district court never specifically addressed whether a reasonable jury could find that the WUSA 9 interview made the difference in Patten's decision to fire Johnson. We leave that question for the district court to address on remand.

## C.

Because Johnson may be able to demonstrate that Patten violated her First Amendment right to speak without

retaliation, we turn to the second prong of the qualified immunity inquiry: whether Johnson's right was clearly established at the time Patten acted. A right is clearly established if "existing precedent . . . placed the statutory or constitutional question beyond debate." *Hedgpeth v. Rahim*, 893 F.3d 802, 806 (D.C. Cir. 2018) (quoting *White v. Pauly*, 580 U.S. 73, 79 (2017)).

"It is clearly established that a State may not discharge an employee on a basis that infringes that employee's constitutionally protected interest in freedom of speech." *Rankin*, 483 U.S. at 383. More specifically, where an employee speaks as citizen and "addresse[s] a matter of public concern," state actors are forbidden from disciplining the employee unless they can identify "a state interest that outweighs [the employee's] First Amendment rights." *Id.* at 388. If the state identifies no interest, then the test requires no balancing. Punishing the employee for her speech is forbidden.

That simple equation resolves Patten's qualified immunity claim. As we explained, defendants acknowledge that Johnson spoke on a matter of public concern when she participated in the WUSA 9 interview. And defendants identify no state interest that might weigh against Johnson's right to give such an interview. Patten thus lacks qualified immunity if she indeed fired Johnson based on the interview.

We reached a similar conclusion in *Navab-Safavi v. Glassman*, 637 F.3d 311 (D.C. Cir. 2011), rejecting a claim of qualified immunity at the motion to dismiss stage where a plaintiff plausibly alleged that nothing about her speech meaningfully endangered any government interest. *Id.* at 317-18. If the plaintiff established those allegations as true, then "the unlawfulness [of the officer's conduct] [would] be apparent." *Id.* at 317 (first modification in original) (quoting

*Wilson v. Layne,* 526 U.S. 603, 615 (1999)). Johnson will bear the burden to persuade the jury of Patten's retaliatory motivation. If the jury finds that Patten fired Johnson for giving an interview to WUSA 9 without Patten persuading the jury that she would have fired Johnson even absent the interview, then Johnson will be entitled to relief.

## IV.

For the foregoing reasons, we reverse in part and affirm in part the district court's order of March 28, 2024, and remand for further proceedings consistent with this opinion.

*So ordered.*